IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

FLOYD BLEDSOE,

          Petitioner,

    vs.                     **Case No. 07-3070-RDR**

LOUIS BRUCE, Warden,
Hutchinson Correctional
Facility; and ATTORNEY
GENERAL OF KANSAS,

          Respondents.

_____

<u>**MEMORANDUM AND ORDER**</u>

I. INTRODUCTION

This case is before the court upon petitioner's request for relief pursuant to 28 U.S.C. § 2254. Petitioner was convicted after a jury trial of one count of first degree murder in violation of K.S.A. 21-3401(a), one count of aggravated kidnapping in violation of K.S.A. 21-3421, and one count of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(2)(A) in the state district court for Jefferson County, Kansas. He was sentenced to life in prison. His convictions were affirmed on direct appeal. <u>State v. Bledsoe</u>, 39 P.3d 38 (Kan. 2002). Petitioner filed a state habeas corpus petition pursuant to K.S.A. 60-1507. Habeas relief was denied by the state district court and this action was affirmed by the Kansas Supreme Court. <u>Bledsoe v. State</u>, 150 P.3d 868 (2007).

II. EVIDENCE AND ARGUMENT AT TRIAL

The victim of the crimes alleged against petitioner was petitioner's 14-year-old sister-in-law, whom the court shall refer to as "C.A." She lived in a trailer home at 15200 Fairview Road in or near Oskaloosa, Kansas with petitioner, his wife Heidi (C.A.'s sister), and their two small children, Cody and Christian. Cody was two years old, closer to three at the time of the murder. Christian was a baby.

Living with her sister Heidi and petitioner allowed C.A. to attend a different school than if she were living with her mother. This was C.A.'s preference. She also may have been having some problems with her mother, although they maintained frequent contact with each other.

At this time in her life, C.A. regularly attended the church services and activities conducted at or by the Countryside Baptist Church. These services and activities occurred twice on Sunday, as well as Wednesday and Friday evenings. Petitioner also attended church; not every service, but mostly on Sundays. Tr. 80.

Tom Bledsoe, petitioner's brother, was 25 years old during the time in question. He worked as a security guard in Lawrence, Kansas, and lived with his parents near Oskaloosa, Kansas at 11477 Osage Road.

Petitioner had a job as a hired hand at the Zule dairy farm. The Zule home is at 20213 106th St., McLouth, Kansas. The dairy

farm is about an eighth of a mile from the home.  Petitioner's wife had a job working from 3:00 p.m. to 11:00 p.m. in Lawrence, Kansas.

C.A. disappeared after leaving the school bus on Friday, November 5, 1999.  On that day, petitioner went to work at the dairy farm at approximately 9:30 a.m.  His wife Heidi rode to work in Lawrence with a co-worker in the afternoon.  She left the children with a baby-sitter.

Tom Bledsoe's normal hours of work were 3:00 p.m. to 11:00 p.m.  But, he did not work on November 5, 1999.  He drove to Lawrence, anyway, in the afternoon to pick up his paycheck.  After that, he spent time in Lawrence looking at outdoor sporting supplies.  He purchased ammunition for a 9 mm semiautomatic pistol which he had purchased two weeks earlier.  This was the murder weapon in this case.  He also bought ammunition for another gun at the same store.  A receipt showed that the purchases were made at 4:30 p.m.  Testimony indicated that the time on the receipt was relatively accurate.  Tr. 493.  A telephone record showed that Tom Bledsoe called his father's phone number at 4:25 p.m.  He did not reach his father.  Tom Bledsoe testified that he made this call after he purchased the ammunition and that he purchased the ammunition around or after 4:00 p.m.  It takes in excess of 30 minutes to drive from Lawrence to Oskaloosa.  Tr. 495.  Tom Bledsoe testified that he did not drive by petitioner's home on his way back from Lawrence.  Tr. 336.

Petitioner was working with his boss, Richard Zule, at Zule's house at about 4:00 p.m. when Zule asked petitioner to drive to a hardware store to buy some duct tape. Petitioner drove Zule's rundown pickup truck to the store. Petitioner purchased the duct tape at Winchester Hardware at 4:20 p.m. He also purchased a black sweatshirt. Petitioner chatted for a while at the store prior to leaving. Zule estimated that petitioner returned with the duct tape at about 4:40 p.m. Tr. 221.

C.A. was transported to petitioner's house by the school bus at 4:20 p.m. At 5:00 or 5:10 p.m., Robin Meyer, a friend of C.A.'s, dropped by the trailer to visit C.A. She saw C.A.'s coat and school bag, but C.A. was not there. The lights were off in the residence. Nothing looked unusual. Meyer thought that C.A.'s mother had picked her up.

Petitioner told one law enforcement officer that he stopped by the trailer not long after C.A. departed the school bus, but that he only pulled into the driveway and then backed out. He also denied saying this in the same interview. Tr. 184-85. Another officer testified that petitioner told him that he went to the trailer, but C.A. was nowhere to be found. Tr. 235.

After petitioner returned to the Zule residence with the duct tape, he was sent on a four-wheeler to check on a sick cow at about 5:15 p.m. Tr. 226.

William Knoebel, a colonel in the United States Army stationed

4

at Fort Leavenworth, was hunting deer in the area of the Zule dairy.   He testified that at about 5:45 p.m. he heard a woman scream, "Please don't hurt me" and call for help.  He left his deer stand and attempted to run to where the sound came from.   But, he did not see anybody.   Nor did he hear any gunshots.   Zule testified that he did not hear anything at that time.   Tr. 227.

Zule testified that at about 5:50 p.m. he saw petitioner starting to get the cows in for the evening milking.  Tr. 222.  He estimated that petitioner started milking at about 6:30 p.m. and that he would take three and a half or four hours or even longer than four hours to finish milking, and then a half hour to clean up.   Tr. 223-24.   Zule had 110 cows to be milked.

Tom Bledsoe testified that when he returned home from Lawrence, his parents were not at home.   Tom had a faithful habit of attending all the services at the Countryside Baptist Church. He had done so for many years.   He attended the Friday evening activity on November 5, 1999.   He was observed there at approximately 6:30 p.m.   Tr. 523.   Another person told law enforcement that Tom arrived at about 7:00 p.m.   Tr. 203.   He returned to his parents' home about 9:30 p.m.   His parents still weren't there.   They arrived about 10:00 p.m. and said that he was in bed when they arrived.   Tr. 445.   The Bledsoes had an alarm system with an automated voice which announced whenever a door was opened.   They did not hear the alarm announce that a door had been

5

opened that night.  The Bledsoes also have a dog that barks when strangers arrive and sometimes when the Bledsoes arrive.

Petitioner's wife, Heidi, testified that her mother told her that she called petitioner at the dairy to tell him that C.A. was not at home and that she didn't go to church.  She said that her mother told petitioner that she was going to call the police, but that petitioner told her to hold off and that when he got off work - close to midnight - he and Heidi would look for her.  She also testified that her mother told her that she and her brother went to the dairy to see petitioner around 11:00 p.m., but petitioner was not there.  Heidi's brother, Dale Arfman, testified that he and his mother went to the dairy around 11:00 p.m., but did not find petitioner.  Arfman admitted, however, that he never really looked at his watch.  Tr. 259, 266.  Phone records were introduced which showed that several phone calls were made from the Zule dairy to C.A.'s mother's residence between 11:00 p.m. and 12:00 a.m.  Tr. 527.  Additionally, Kirk Vernon, a Jefferson County Sheriff's Department employee, stated that C.A.'s mother told him that she arrived at the Zule dairy shortly before midnight on November 5, 1999 and then went to petitioner's home.  Tr. 577.  Richard Zule also testified that petitioner called him at 11:30 p.m. to tell him about a sick cow and to ask what to do about the cow.  Tr. 222. Zule said he would check on the cow in the morning.

Heidi  Bledsoe  returned  home  from  work  about  midnight.

6

Petitioner pulled in right behind her and told her that C.A. was missing and that they needed to find her.  They checked first at Robin Meyer's house.  Then, they split up.  Heidi went in Robin Meyer's car and petitioner left in his car.  They met back at their house.  C.A.'s mother and brothers were there.  Heidi decided to put in a police report and told petitioner to pick up their children.  Petitioner drove to Brandi Wampler's residence to pick up his children.  He took the children to the police station and told his wife that he was going to Ottawa to see if her sister Rebecca had seen C.A. and then he was going to go to Quenemo to check with another of C.A.'s and Heidi's sisters.  He asked if she wanted to go with him, but she declined.  Tr. 105.  He said he was going to take the children back to Brandi Wampler and see if they could spend the night there.

There was also testimony that during the early morning hours, petitioner asked a friend if he could borrow his car to get some gas from petitioner's uncle because petitioner had run out of gas in petitioner's car.  Tr. 212.

Brandi Wampler testified that she had petitioner's children from 12:45 p.m. on November 5, 1999 until 12:45 a.m. on November 6, 1999, when petitioner dropped by to pick them up.  She stated that petitioner brought the children back at 2:45 a.m. to ask if she would watch the children while he went to Pomona to see if Heidi's

7

sister had picked up C.A.[1]  She said that petitioner did not retrieve the children until 8:30 a.m., although he said that he would be back in an hour and a half.

A Lawrence off-duty police officer who was working security at a gas station in Lawrence testified that he saw petitioner some time between 2:00 a.m. and 3:00 a.m. on November 6, 1999.  He said that petitioner told him he was looking for a missing girl who might be in a black pickup truck with someone by the name of Summerville.  Several months before, a complaint had been made to Jefferson County police about a man named Billie Summerville who was making advances to C.A.

Heidi's sister Rebecca testified that petitioner came by her house in Ottawa and asked about C.A.  Then he left to visit Rebecca and C.A.'s sister in Quenemo, which was about ten minutes away, before returning to Ottawa.

Richard Zule testified that petitioner called him from Ottawa about 6:00 a.m. to ask if he could borrow the four-wheeler to search for C.A.

Petitioner returned to his Oskaloosa home with C.A.'s sister Rebecca and her son Alex at about 6:30 a.m. on November 6, 1999. Rebecca estimated that it was an hour and 45-minute drive between Ottawa and Oskaloosa.

Jefferson County Sheriff's Officer Robert Poppa saw petitioner

---

[1] Pomona is a small town close to Ottawa and Quenemo.

at a Casey's store in Oskaloosa at approximately 7:30 a.m. on November 6, 1999.  Petitioner wanted to know why an officer had not come by his house to investigate C.A.'s disappearance.  Officer Poppa apparently was unaware of the police report.  He went with petitioner to petitioner's house and spoke about the matter and then returned to the police office at about 7:59 a.m.  There, he learned about a report of a girl screaming out on Wild Horse Road near the dairy.  The report was made at 7:02 p.m. on November 5, 1999, but it did not say when the screams were heard.

At 8:00 or 9:00 a.m. a black short-bed truck was seen coming out of the brome field where C.A.'s body was eventually discovered. Tom Bledsoe's vehicle was a small black Mazda pickup truck.   Tr. 281-82, 474.

Tom Bledsoe's parents testified that Tom spent the morning of November 6, 1999 with them, helping to unload a trailer which was used to haul property that belonged to his recently deceased grandmother.  They said he stayed at the house when they left to pick up another load.

Petitioner was seen at the Casey's store Saturday morning.  He was also observed at the high school in Oskaloosa with fliers regarding C.A. during the late morning or early afternoon.  Tr. 571.  He was seen stopping traffic in the early afternoon to inquire if people had information regarding C.A.  Tr. 581.  One witness, Scott Harries, testified that he stopped traffic with

9

petitioner in the morning and afternoon until around 1:30 p.m. on November 6, 1999.  Tr. 215.  Randy Carreno, a detective for the Jefferson County Sheriff's Office, testified that he was at petitioner's home from 9:00 a.m. until 12:17 p.m. and that petitioner was there the entire time.  Tr. 615-16.  He later saw petitioner stopping traffic to show persons a picture of C.A. at 1:48 p.m.  Tr. 617.  At that point, petitioner asked to ride with Carreno and did so until about 5:30 p.m.

Tom Bledsoe testified that he saw petitioner sometime between 11:00 a.m. and 1:00 p.m. on November 6, 1999 on the edge of Oskaloosa.  He said he was driving his vehicle and that petitioner was in his car.  He said that he waved petitioner to stop and that he asked petitioner if C.A. had been found.  Petitioner told him no.  Tom asked about fliers and then said he heard that the police were looking for C.A.  Tom testified that petitioner looked nervous and had his head on his arm.  Tom said he asked petitioner what was wrong and petitioner told him that C.A. was dead.  When Tom inquired further, he said petitioner mumbled that he "accidentally shot her."  Tom testified that he started firing questions at petitioner and asked if petitioner had raped her or sexually abused her.  Tom said that petitioner replied, "yes, no, I don't know," and that petitioner recalled C.A.'s shirt and bra being above her breasts.  Tom testified that petitioner told him that he shot C.A. with petitioner's pistol and that he shot her two or three times,

once in the back of the head and twice in the chest.  Tom stated
that he asked where C.A. was and that petitioner told him she was
in the trash dump behind his parents' house.   Tom said that
petitioner told him not to tell anyone and if anyone came around
snooping, for Tom to take the blame.  According to Tom, petitioner
told him if he didn't keep quiet then petitioner would tell people
about Tom's past.   Tom said he was shocked, confused and angry
after speaking with petitioner.  He left to fill his vehicle with
gasoline.   Then, he ran an errand, dropping something off at a
friend's house.  After that, he drove to work in Lawrence, where he
arrived about ten minutes before 3:00 p.m.

    Tom Bledsoe has a hearing impairment.  He stated that he was
not sure whether petitioner said "I," "we" or "they" shot C.A.  He
said that petitioner was mumbling and that the engine in his
vehicle was running at the time of petitioner's alleged confession.

    Although they are brothers, petitioner and Tom Bledsoe were
not close.   The testimony was that they did not like each other.
Petitioner's alleged threat to tell people about Tom's past meant
to Tom that petitioner would call attention to Tom attempting to
have sex with a dog at one time.   Petitioner also knew that Tom had
had at least one pornographic magazine and was seen playing with
himself while watching a pornographic video.

    Tom Bledsoe normally kept a pistol in his truck and he left
his truck unlocked.   He testified that petitioner was aware of

11

this, although petitioner did not know that Tom had recently purchased the 9 mm pistol and had it in his truck.  He checked the gun while he was at work and found that the barrel had a burnt smokey smell and that it had only two shells in it, when he had loaded it with ten.  Tr. 290-91.  Tom testified that he drove straight home from Lawrence after he got off work at 11:00 p.m. When he reached home, he drove to the trash dump.  Using a flashlight, he saw that some trash was out of place and he noticed some shovel marks in the side of the bank.  He stated that he lifted some plywood up, but could not see much.  However, he said he decided that what petitioner told him was true.  He walked down a fence line to see if he could find a shovel that he remembered leaving there previously.  He saw the shovel and then returned to his truck and back to his house.  Tom testified that when he returned to his house, he took his gun inside and put it in a dresser drawer in his room.  Tom admitted that he told the police different versions of what he did at the trash dump that night. Tr. 354, 357.

     According to Tom Bledsoe and Heidi Bledsoe, petitioner did not own any guns and never has.  Tr. 119, 342.

     Tom's mother, Mrs. Catherine Bledsoe, was awake when Tom returned to the house.  She was watching one of petitioner's children, Christian.  Heidi had attempted to leave the other son, Cody, with her too, but Cody threw a fit and did not want to be

12

left with her, which was unusual for him. Mrs. Bledsoe had Christian until about 1:30 a.m. when she called and reached Heidi. Heidi told her that petitioner was supposed to pick him up earlier, but she didn't know where he was. So, Heidi came over and picked up Christian.

Petitioner wore the black sweatshirt he purchased at the hardware store from Friday night through Sunday; he did not change his clothes. Tr. 118.

Tom testified that he awakened about 8:00 a.m. on Sunday November 7, 1999, drank coffee with his parents, helped unload lumber from a trailer, went to his late grandmother's place to get some machinery, returned home and got ready for church. Church was at 9:45 a.m. Before going to church, Tom stopped at petitioner's house to take Cody, petitioner's two-year-old son, to church. He had done this in the past, but Cody did not go with him on November 7, 1999.

C.A.'s disappearance was mentioned at the church service and prayers were said. After the service, Tom returned home and helped his father that afternoon. Then, he got ready for the Sunday evening service at 6:00 p.m. Jim Bolinger conducted the service. Tom felt close to Bolinger. Again, C.A.'s disappearance was mentioned. Bolinger looked at Tom and said if he knew where C.A. was he would go get her.

After the church service, Tom went to the police station.

13

While he was there, he left a phone message on Bolinger's answering machine.  The message was:

> Hi, Jim.  This is Tom.  I wanted you to be the first to know.  I know I lied to you.  I know where [C.A.] is. When you get this message I'm going to turn myself in to the police.  I said – – I wished I never did it.  I hurt the church, I hurt God, most of all, I let everyone down. All I can say is I'm sorry.  I'll pay for the rest of my life for what I've done.  All I can ask is for the church to remain strong.  Please forgive me.  As a favor, please remember my mom and dad.  Help them when they go through, help with the pain I'm about to – – thank you, Jim. Sorry.  Goodbye.

Tr. 309.  After leaving this message, Tom called his mother and father.  He told his father that he knew where C.A. was and that she was dead.  Then, his father cut him off and told him to wait and he would come up.

Then, Tom called Jim Bolinger again and left another message on the answering machine.  This message was:

> Hi, Jim.  Me again, Tom.  Please help me and my dad – – please help my mom and dad through this.  Right now they're disappointed.  I know that the church will be, too.  All I can ask, forgive me for what I have done and I will pay for the rest of my life.  I wanted to tell you in front of the church, but I didn't have enough guts. I'm sorry.  I don't know what went through my mind. Right now you're probably pretty shocked.  I wish I could turn the clock back, but I can't.  Made my choice.  I wish I didn't.  Sorry.  Bye.

Tr. 310-11.  Tom was arrested that night.  At some point, he was interviewed by a KBI agent.  Tom told the KBI agent that he killed C.A.  Tr. 190.

Officers found C.A.'s body in a trash dump in a ravine on the property where Tom Bledsoe lived with his parents.  The body was

14

underneath dirt, plywood, trash and debris.  C.A. had been shot in the back of the head such that the gun had been placed against the nape of the neck.  She was also shot twice in the chest.  Her shirt and bra had been pulled over her breasts.  There was some evidence of defensive wounds on C.A.'s hands, although it was possible that they were not defensive wounds and merely the result of dragging the body.  Tr. 432 & 437.

During the week following his arrest, Tom Bledsoe recanted any statements indicating that he killed C.A.  He implicated his brother, the petitioner.  Petitioner was arrested in the early morning of Saturday, November 13, 1999.  He had been brought in for questioning earlier on Friday, November 12, 1999.

During petitioner's trial, evidence was presented that petitioner and his wife Heidi were planning to divorce each other and that this was known to C.A. prior to her murder.  Testimony indicated that petitioner asked C.A. where she would live after he and his wife were divorced.  Tr. 411.  C.A. wanted to live with Rosa and Jim Bolinger, who were church leaders at the Countryside Baptist Church.

Evidence was presented that C.A. said she was afraid to be alone with petitioner because he was always hitting on her and trying to wrestle with her.  Tr. 80, 411.  There was also testimony that C.A. told a friend that she was happy living with petitioner and Heidi Bledsoe; she just did not want to be in the middle of

their divorce.  Tr. 621.

Petitioner's wife testified: that she could discern no reason for C.A. to be afraid of petitioner; that C.A. did not like petitioner but did not say she was scared of petitioner; and that petitioner treated C.A. like a sister and cared about her.  Tr. 108-9, 115.

There was testimony that during interrogation, petitioner said he loved C.A.  Once, he was told by his interrogators to say he loved C.A.  Tr. 188.  One officer stated:

> I asked [petitioner] if he had ever had an affair with [C.A.] and he said never.  I asked [petitioner] if he ever thought of having an affair with [C.A.] and he said he did eight to nine months ago.  I said what kind of an affair? [Petitioner] said like the one that he has with Heidi, his wife.  I said you mean like a sexual relationship, with children and all?  And he said yes.

Tr. 147.

On cross-examination, petitioner's counsel attempted to add some context to this testimony.

> Q. And you said did you ever think about having an affair; correct?
> A. Yes.
> Q. And when he answered he didn't say yes, he said no and then said well, maybe about eight or nine months ago I thought about it once.  Isn't that correct?
> A. Yes, that's correct.
> Q. And you asked did you ever tell her; correct?
> A. Yes.
> Q. And he said no?
> A. Right.
> Q. And when you said an affair he said, well, if things were different, and went on and talked about it; correct?
> A. That's correct.
> Q. Now, you didn't expand on if things were different, whether if [C.A.] was older or he wasn't married or what

the situation was, correct, you just moved on?
A. That is correct.
Q. So when he says like he and Heidi, fair to say married?
A. That's correct.
Q. But he indicated he never pursued it.  Isn't that correct?
A. That's correct.
Q. And there's really no indication that he did?
A. Not to my knowledge, no, sir.

Tr. 149-50.

There was also testimony that during interrogation Tom Bledsoe said he loved C.A.  Tr. 358.  Other testimony indicated that Tom Bledsoe did not have much contact with C.A. during church functions; that Tom felt C.A. respected him; and that he considered her a friend.  On the Wednesday prior to the crimes in this case, Tom Bledsoe gave C.A. a ride home from church.  Tr. 326.

There was testimony that petitioner was not a violent person. Tr. 214.

Petitioner's mother testified that she received a call from petitioner while he was in jail.  She told petitioner that she knew that Tom Bledsoe did not kill C.A. and petitioner replied, "Yes, I know Tom didn't do it, somebody else did it."  Tr. 452.  She further stated that petitioner even suggested that perhaps his father committed the crime.  Petitioner had made comments prior to his arrest to the effect that Billie Summerville should be a suspect in the investigation.

During the trial, petitioner's counsel elicited testimony from Rosa Bolinger that on November 8, 1999 Cody Bledsoe, petitioner's

17

two-year-old son, told her that Tom Bledsoe shot C.A., put Cody's blanket and C.A.'s blanket around her, and put her in a dump.  Tr. 87.  She stated that she believed Cody saw what happened and that it was real to him.  A school psychologist testified that a student told her that Cody made a similar statement at a Sunday church service.  Tr. 93-4.  The student said Cody was talking about something he had seen.

The prosecutor then questioned petitioner's wife.  She stated that at first Cody stated that Tom Bledsoe shot C.A.  Tr. 109.  Then, she said that Cody changed his story after petitioner was arrested.  At that point, Cody said that petitioner shot C.A.  Petitioner's wife testified that Cody's words were graphic enough to indicate that he observed the killing.

During opening argument, the prosecutor made references to Cody's alleged statements.  During closing argument, the prosecutor emphasized a theory that placed Cody at the scene of the crime.  The prosecutor stated:

> I can't tell you when [petitioner] did it.  But I can tell you who was there.  He wasn't alone.  We know there was at least three people there, him and [C.A.], and he brought his son.  His son sat in the vehicle and he watched [petitioner] put the gun to the back of his aunt's head and pulled the trigger.
>     [Petitioner] takes care of the body, gets back in the car, Cody says, "You killed [C.A.]."  Imagine what went through that boy's mind.  When [petitioner] convinced his two-year-old son to say Tom did it, as soon as that powerful influence of his father was out of his presence he was comfortable with telling the truth, spontaneous comments by two-year-old children, going to the grave site, a spontaneous - - two-year-old children

don't use a lot of reasoning or deduction, but when he
goes to [C.A.'s] grave he explains to her, because he was
there, that he didn't do it.  "[C.A.], I didn't kill you,
my dad did."
. . . .
        Ladies and gentlemen, Mom, [petitioner], and Cody
explained to you it was [petitioner].  Tom couldn't have
done it.  [Petitioner's] wife, his wife explains to you,
and she, her testimony clearly wasn't skewed.  It didn't
present all kinds of bolstering testimony for the State
to show that her husband had killed her sister.  What it
did do was it reinforced the fact that Cody was there.
Her perception, she'd raised him since he was young, Cody
was there.  A psychologist, based on the information she
said, Cody was there.  There's only one way Cody could
have been there, ladies and gentlemen.  He didn't walk,
he didn't crawl, he didn't ride a horse; he was with his
father when [C.A.] was killed.  He was never with Tom
that whole evening.  He was with [petitioner].

Tr. 662, 665.  As will be discussed later, this portion of the

closing argument misrepresented the evidence in some respects.

There was no fingerprint evidence, no blood evidence, no DNA

evidence and no hair evidence introduced during the trial which

linked petitioner or Tom Bledsoe to the crime.  There was no

indication of where C.A. was killed.  Nor was the time of death

specified.

Additional evidence from the trial may be referenced in the

context of discussing the parties' arguments in this matter.

III. HABEAS STANDARDS

A writ of habeas corpus may not be granted unless the state

court's decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by

the Supreme Court of the United States," or, "was based on an

19

unreasonable determination of the facts in light of the evidence presented at trial." 28 U.S.C. § 2254(d)(1)&(2).  State court factual findings, including credibility findings, are presumed correct, absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); see also Smith v. Gibson, 197 F.3d 454, 459 (10th Cir. 1999) cert. denied, 531 U.S. 839 (2000); Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998) cert. denied, 526 U.S. 1047 (1999); Nguyen v. Reynolds, 131 F.3d 1340, 1359 (10th Cir. 1997) cert. denied, 525 U.S. 852 (1998).

The Supreme Court has stated that a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in our cases" or if the state court "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

IV. STATE HABEAS RULING

After his conviction was affirmed on direct appeal, petitioner filed a state habeas petition pursuant to K.S.A. 60-1507.  Petitioner argued that he received ineffective assistance of

counsel.   After conducting an evidentiary hearing, the state district court found to the contrary.  This ruling was appealed to the Kansas Supreme Court.  The Kansas Supreme Court considered numerous allegations of deficient representation.  The court rejected several claims of ineffective assistance of counsel. However, the court agreed with petitioner that his attorney was deficient in four respects.

First, the Kansas Supreme Court held that petitioner's counsel performed unreasonably when he pursued a strategy that would place the statements of petitioner's son, Cody, into evidence.  Cody was not considered a competent witness and was not called to the witness stand at trial.  Nevertheless, petitioner's attorney thought it was advisable to bring Cody's statement that Tom killed C.A. into evidence, knowing that it would lead to the introduction of Cody's later statement that petitioner killed C.A.  The Kansas Supreme Court said it considered this strategy a "huge mistake." 150 P.3d at 880.  In addition, petitioner's attorney did not object to the testimony of Rosa Bolinger and petitioner's wife that it appeared that Cody actually saw the killing, even though there was no explanation of how this was possible and no authority provided for how they could tell if Cody actually saw the killing.  The Kansas Supreme Court did not find this unreasonable only because it was consistent with the mistaken strategy of allowing Cody's statements into evidence.

21

Second, the Kansas Supreme Court held that it was an unreasonable mistake for petitioner's counsel to fail to object when a witness vouched for the truth of petitioner's statements during interrogation that he stopped by the trailer about the time of C.A.'s disappearance and that he loved C.A.  Jefferson County Sheriff's Detective Troy Frost testified:  that petitioner made these statements; that he believed petitioner; and that he thought that petitioner's statement regarding his love for C.A. was genuine.

Third, the Kansas Supreme Court held that it was an unreasonable mistake for petitioner's counsel to fail to object to misrepresentations of the evidence in the prosecutor's closing argument.  The prosecutor said during closing argument that, "The physical evidence shows that Tom didn't do it." Tr. 662.  However, there was no physical evidence that excluded Tom as the killer.  In addition, the prosecutor stated in his closing remarks that Cody said at C.A.'s grave site, "I didn't kill you, my dad did."  Tr. 662.  This was incorrect.  The evidence was that Cody said at the grave site "[C.A.], I didn't shoot you, it wasn't me."  Tr. 110. Also, contrary to the prosecutor's closing argument, a psychologist did not state that Cody was at the murder scene.  The Kansas Supreme Court held that these statements were subject to a sustainable objection and that the failure to make such an objection constituted deficient representation.

Fourth, the Kansas Supreme Court held that petitioner's counsel made an unreasonable mistake during voir dire. Near the conclusion of his questioning of the prospective jurors, petitioner's counsel made these comments:

> "Everybody remember the Susan Smith case? I know it's been a few years. Anybody recognize that name? Little gal that finally fessed up to drowning her little children? Anybody remember that now few years ago? Remember how she went on TV in front of everybody saying, asking where her children were and what happened and it was emotional, just like this one will be, and you wanted to believe her because you couldn't believe that somebody would do that to her own children. Ladies and gentlemen, I'm going to tell you that's the same kind of situation we have here. Don't decide this case until you've heard it all, because you're definitely going to hear two sides."

Tr. 38-39.

As the court explained, the Smith case involved a mother, Susan Smith, who initially made false reports that her children had been carjacked by an African-American man. She tearfully pleaded on television for her children's rescue. Nine days later, after an intensive and well-publicized search, Smith confessed to letting her car roll into a lake, drowning her children inside. It should be noted that, according to petitioner's testimony at his state habeas hearing, he went on television before C.A.'s body was found, to ask for help and information regarding her disappearance. Habeas Tr. 128. The Kansas Supreme Court concluded that using an analogy in voir dire to a case involving a convicted murderer of children who initially lied and asked the public to help search for

the children was objectively unreasonable representation.

Although the court found that petitioner's representation "fell below the constitutional threshold of objective reasonableness," it determined that petitioner had "not demonstrated that any one of these individual failings, or that these failings considered collectively, so undermined the fairness of his trial as to impair our confidence in its outcome." 150 P.3d at 886. The court noted: that the critical issue was Tom Bledsoe's credibility; that the jury was aware of Cody's age and the inconsistency of his statements; that Detective Frost's statements regarding the genuineness of petitioner's expressed love for C.A. and whether he stopped at the trailer were a small part of the record; that petitioner's statements on these topics would have been admitted for the jury to consider in any event; that the prosecutor's misstatements in closing argument "were not enough to take the jury's eyes off this ball;" and that petitioner's counsel, in spite of the unfortunate analogy in voir dire, communicated his thought that the jury would have to decide the credibility of Tom Bledsoe after hearing both sides of the story. 150 P.3d at 886-87. The court concluded its opinion with this statement, which has proven controversial for the purposes of the instant habeas petition:

> On the record before us, this was a difficult case. Two brothers accused each other of vile crimes. There was ample evidence to support each accusation. The jury, after weighing all of its substance and the credibility of the many witnesses, was persuaded that the State prosecuted the right brother. Although, in the hands of

24

another defense lawyer, the case may have been tried to another conclusion, "may" is not good enough.  In order to reverse, we must be convinced that, but for counsel's deficiencies, there was a reasonable probability of a different outcome.  <u>Gleason</u>, 277 Kan. at 644, 88 P.3d 218.  We are not so convinced. [Petitioner's] trial, while not perfect, was fair.  See <u>State v. Johnson-Howell</u>, 255 Kan. 928,952, 881 P.2d 1288 (1994).

150 P.3d at 887.

V. ARGUMENT AND ANALYSIS

A. <u>Ineffective Assistance of Counsel</u>

Petitioner argues that he was denied his Sixth Amendment right to effective assistance of counsel.

Ineffective assistance of counsel claims are governed by the standards in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  "A petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced the petitioner's defense." <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003).  "Deficient performance" is proven by demonstrating that counsel's performance "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688.  "Prejudice" is proven by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u> at 694.  This standard requires less than a preponderance of the evidence; petitioner does not have to prove more probably than not that the outcome would have been different.  <u>Smith v. Mullin</u>, 379 F.3d 919, 942 (10th Cir.

25

2004).

The Supreme Court has stated:

> A fair assessment of attorney performance
> requires that every effort be made to
> eliminate the distorting effects of hindsight,
> to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the
> conduct from counsel's perspective at the
> time. Because of the difficulties inherent in
> making the evaluation, a court must indulge a
> strong presumption that counsel's conduct
> falls within the wide range of reasonable
> professional assistance; that is, that the
> defendant must overcome the presumption that,
> under the circumstances, the challenged action
> might be considered sound trial strategy.

Strickland, 466 U.S. at 689 (interior citations and quotations omitted).

In making the prejudice determination, a court must evaluate the totality of the evidence, that adduced during trial and during the habeas proceedings.  Smith, 379 F.3d at 942.

> Some of the factual findings will have been unaffected by
> the errors, and factual findings that were affected will
> have been affected in different ways.  Some errors will
> have had a pervasive effect on the inferences to be drawn
> from the evidence, altering the entire evidentiary
> picture, and some will have had an isolated, trivial
> effect.  Moreover, a verdict or conclusion only weakly
> supported by the record is more likely to have been
> affected by errors than one with overwhelming record
> support.  Taking the unaffected findings as a given, and
> taking due account of the effect of the errors on the
> remaining findings, a court making the prejudice inquiry
> must ask if the defendant has met the burden of showing
> that the decision reached would reasonably likely have
> been different absent the errors.

Strickland, 466 U.S. at 695-96.

Petitioner's ineffective assistance contentions were decided

26

against him by the Kansas Supreme Court.  His contentions raise issues of law or issues of how the law was applied to the facts. Therefore, as previously discussed, he is entitled to federal habeas relief only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

### 1. Application of the correct standard

Petitioner first argues that the Kansas Supreme Court applied the wrong standard to determine whether his trial counsel's deficient representation caused prejudice to his defense.  There can be no question that the Kansas Supreme Court repeated the correct standard in its order denying petitioner's state habeas petition.  The court stated that: "[W]e must be convinced that, but for counsel's deficiencies, there was a reasonable probability of a different outcome."  150 P.3d at 887.  However, immediately before this sentence, the court stated:  "Although in the hands of another defense lawyer, the case may have been tried to another conclusion, 'may' is not good enough."  Id.  It is unclear why "may" is not good enough.  Strickland does not establish an "outcome-determinative standard."  466 U.S. at 693.  It is not necessary for a petitioner to prove that his counsel's deficient conduct definitely or even more likely than not altered the outcome of the case.  Id.  If by "may have been tried to another

27

conclusion" the Kansas Supreme Court meant that there was a reasonable probability of a different outcome, then "may" is good enough to warrant habeas relief.  But, immediately thereafter the court stated that it was not convinced that there was such a reasonable probability.  So, we assume that the court meant by "may" that there was a trivial probability, not a reasonable probability, that absent counsel's deficient performance, a juror would have found a reasonable doubt respecting petitioner's guilt. Strickland holds that a petitioner must show more than just "some conceivable effect on the outcome of the proceeding."  466 U.S. at 693.[2]

        As respondent has argued, in Woodford v. Visciotti, 537 U.S. 19, 24 (2002) and Holland v. Jackson, 542 U.S. 649, 654-55 (2004), the Supreme Court has held that a federal habeas court must attempt

_____

        [2]The court has also considered the last sentence in the Kansas Supreme Court's discussion of the prejudice prong of the Strickland test.  The court stated: "[Petitioner's] trial, while not perfect, was fair."  This is not the test of prejudice under Strickland.  In Williams, the Court rejected the Virginia Supreme Court's formulation of the Strickland test for prejudice because it considered not only whether there was a reasonable probability that the outcome would have been different, but also whether the result of the proceeding was fundamentally unfair or unreliable.  529 U.S. at 394-95.  According to the Tenth Circuit, the application of this "more onerous standard was contrary to the Supreme Court's clearly established precedent in Strickland."  Spears v. Mullin, 343 F.3d 1215, 1248 (10th Cir. 2003) cert. denied, 541 U.S. 909 (2004); see also, Short v. Sirmons, 472 F.3d 1177, 1196 (10th Cir. 2006) cert. denied, 128 S.Ct. 103 (2007).  Still it must be acknowledged that Strickland also speaks in terms of fairness and reliability, as well as in having confidence in the outcome.  466 U.S. at 694.  We believe the Kansas Supreme Court's reference to fairness was speaking to having confidence in the reliability of the outcome.

to reconcile a state court's inexact or problematic phrasing of the
Strickland standard with its use elsewhere of the correct language
to state the Strickland standard.  This approach is consistent with
the presumption applied to § 2254 petitions that state courts know
and follow the law.  After giving careful consideration to the
arguments of petitioner, we find that the Kansas Supreme Court
applied the correct Strickland standard to petitioner's claims of
prejudice.  Therefore, the state court's findings regarding
petitioner's ineffective assistance of counsel claims are entitled
to deference, and we must determine at this stage whether those
findings are objectively reasonable.  Spears, 343 F.3d at 1248.

   2. Was a reasonable probability of a different outcome
proven?

   The Kansas Supreme Court held that petitioner did not prove
that "but for counsel's deficiencies, there was a reasonable
probability of a different outcome." 150 P.3d at 887.  Petitioner
contends that this holding is not objectively reasonable.

   As the state court acknowledged, this was a "difficult case."
150 P.3d at 887.  There was no physical evidence which pointed to
petitioner.  There was no physical evidence which exonerated Tom
Bledsoe.  The murder weapon and ammunition belonged to Tom Bledsoe,
and the murder weapon was produced to law enforcement from Tom
Bledsoe's room.  Tom Bledsoe confessed to the crime, but later
recanted.  The only alleged eye witness, Cody Bledsoe, was two

years old and made inconsistent statements.  At first, he said Tom Bledsoe committed the crime.  After petitioner's arrest, he said that petitioner committed the crime.  His statements were admitted as hearsay; he was not subject to cross-examination.

C.A.'s body was found at Tom Bledsoe's residence.  This was also the residence of petitioner's parents.  So, petitioner had a connection to the location.

Petitioner told an interrogator that he loved C.A.  This was argued as a motive for murder.  But, the context of the statement diminishes its force as proof of motive.  Tom Bledsoe also told an interrogator that he loved C.A.

There was evidence that C.A. was scared of being alone with petitioner and that he was hitting on her.  There was also evidence that she was not scared of petitioner and that he cared for her as a sister.

It was argued at trial by different sides that petitioner and Tom Bledsoe had the opportunity to commit the crime.  For each person it is difficult to establish that opportunity within the time lines set forth in the testimony of other witnesses.  C.A. left the school bus at 4:20 p.m. and was not seen at petitioner's trailer by 5:10 p.m. on November 5, 1999.  Various witnesses testified that they saw petitioner at 4:20, 4:40, 5:15 and 5:45 p.m.  Around 6:30 p.m., petitioner was to start the lengthy process of milking approximately 110 cattle.

Tom Bledsoe, according to some testimony and evidence, was in Lawrence, Kansas at about 4:25 p.m., then drove to his home, showered and went to a church function by 6:30 p.m.  He stayed at that function until about 9:30 p.m., when he went home where he was seen in bed at about 10:00 p.m. by his mother.  This testimony not only clouds Tom Bledsoe's alleged opportunity to commit the crime, but also petitioner's opportunity to obtain and return the murder weapon.

It is also difficult to determine when petitioner had the opportunity to have Cody Bledsoe with him at the time he allegedly shot C.A.  The testimony was that Cody was with a babysitter until 12:45 a.m. on Saturday, November 6, 1999.  Petitioner picked up Cody and his baby brother at that time and went to the police station around 1:00 a.m. before returning the children to the babysitter at about 2:45 a.m.

Tom Bledsoe testified that petitioner confessed to the crime to him.  It is difficult to establish when that may have occurred consistent with the testimony of various witnesses.  Tom Bledsoe estimated that this occurred between 11:00 a.m. and 1:00 p.m. on Saturday, November 6, 1999.  However, petitioner was with Detective Randy Carreno from 9:00 a.m. until 12:17 p.m.  Two other witnesses testified that they saw petitioner on Saturday afternoon at the high school and on the road distributing fliers.  Tr. 569-71, 581.  A third witness, Scott Harries, stated that he was with petitioner

helping him stop traffic until about 1:30 p.m.  Tr. 215.  Detective Carreno testified that he was with petitioner again from 1:48 p.m. (when he saw petitioner in the roadway stopping vehicles and holding a photograph of C.A.) until 5:45 p.m. as petitioner rode in Detective Carreno's vehicle.  Tr. 616-17.  Tom Bledsoe testified that petitioner confessed to him at a moment when they were both in their vehicles on the road and that, afterwards, Tom filled his vehicle with gas and delivered some food to a friend before driving to his job in Lawrence (more than a 30-minute drive), arriving at about 2:50 p.m.

Petitioner argues that the result in <u>Fisher v. Gibson</u>, 282 F.3d 1283 (10th Cir. 2002) should be persuasive here.  In that case, Mr. Fisher had been found guilty of capital murder prior to bringing a habeas petition.  The Tenth Circuit decided the habeas petition in Mr. Fisher's favor, finding not only that his trial counsel was professionally deficient, but also that his counsel's errors were prejudicial in the guilt phase of the trial.  As in this case, the facts of the <u>Fisher</u> case were close.  There was little physical evidence pointing to Mr. Fisher's guilt.  The case appeared to boil down to whether the petitioner or another person, who was with the petitioner and testified against him, murdered the victim in the case.  As in the instant case, the person who testified against Fisher was the first suspect arrested for the crime.  The prosecution also used a statement by Fisher against him

during the trial.

However, the defense counsel in <u>Fisher</u> was more severely deficient than defense counsel for petitioner in this case. He not only exhibited deficiencies in investigation and preparation, but he also appeared antagonistic to his client and sympathetic to his client's main accuser. Defense counsel in <u>Fisher</u> did not make a closing argument and failed throughout the trial to advance any theory of defense. In the case at bar, petitioner's counsel clearly attacked the credibility of Tom Bledsoe and supported petitioner's claim of innocence. He advanced a theory of defense and made a closing statement.

Ultimately, these cases must be judged upon their individual sets of facts. Therefore, although we have read and considered the <u>Fisher</u> case, we do not find it controlling or fully persuasive in deciding the case at bar.

The Kansas Supreme Court, in its decision upon petitioner's state habeas petition, concluded that the "huge mistake" of eliciting Cody Bledsoe's statements was not prejudicial, even though those were the only statements by an alleged eyewitness to the crime which were referenced in the trial. The state court also ignored the emphasis given to Cody's statement by the prosecutor in opening and closing argument. The court held that the prejudicial impact was mitigated by the jury's knowledge of Cody's age and the inconsistency of his statements. The court found that the case

boiled down to the jury's perception of Tom Bledsoe's credibility. This overlooked, however, that on direct appeal the Kansas Supreme Court relied on Cody's statements in part to find there was sufficient evidence to convict petitioner.   39 P.3d at 44.

The Kansas Supreme Court minimized the impact of Detective Frost's judgments regarding the genuineness and credibility of petitioner's statements that he loved C.A. and that he had been to the trailer about the time that C.A. would have been there on November 5,1999.  The court noted that the statements made up only a small portion of the record and further observed that the jury would still have heard testimony regarding petitioner's statements even if Detective Frost's alleged vouching had been excluded. However, the court again ignored the emphasis placed by the prosecutor in closing argument upon petitioner's alleged "love" for C.A. as a motive for the crime.  Tr. 657-58.

The Kansas Supreme Court brushed aside the failure to object to the prosecutor's mischaracterization of the record during closing argument.  The court merely stated that the jury understood that it was an issue of whether petitioner or Tom committed the crime and that the prosecutor's misstatements were not enough to take the jury's eyes off the ball.  This, however, ignores that the misstatements related directly to the "Tom versus petitioner" issue.  The prosecutor stated falsely that the physical evidence showed that Tom did not do it.  He stated incorrectly that Cody

said that "Daddy did it" at C.A.'s grave site.  He also falsely claimed that a psychologist said that Cody was at the scene of the crime which, if true, would point to petitioner's guilt. Petitioner's counsel did not object to any of these misstatements in closing argument.  On the other hand, the jury was instructed that an attorney's statements are not evidence and should be disregarded if the statements are not supported by the evidence.

Finally, the Kansas Supreme Court determined that petitioner's counsel's use of a quite unfavorable analogy to the Susan Smith case during voir dire was not so prejudicial as to poison the result of the trial.  The court noted that petitioner's counsel told the jury that the point of the analogy was the value of waiting to hear both sides of a story.

As we have already indicated, we are mindful in considering the possible prejudice suffered from an attorney's deficient performance that "[a] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Strickland, 466 U.S. at 696.

Upon a careful review of the evidence and the arguments, the court believes it is objectively unreasonable to conclude that there would not be a reasonable probability of a different verdict if petitioner's trial counsel had not committed the errors identified by the Kansas Supreme Court.  The evidence in this case

was not strong against petitioner.  There was no physical evidence connecting him to the crime.  The prosecutor argued that petitioner had the opportunity and the motive to commit the crime.  However, the evidence supported a claim that Tom Bledsoe also had the opportunity and possibly the same motive, assuming that "love" is a motive for murder.  Additionally, Tom Bledsoe had confessed to the crime, arguably to more than one person.

In this case, because of his counsel's error, the only statements against petitioner by an alleged eyewitness to the crime were introduced into evidence.  Those were the hearsay statements of petitioner's 2-year-old son, Cody.  Although the same boy had also made a statement naming Tom Bledsoe as the killer, the importance of the evidence in the case against petitioner is suggested by the reference to the evidence by the Kansas Supreme Court on direct appeal.  The significance of counsel's error is also underlined by the prosecutor's closing argument.  If Cody saw the crime occur, as the prosecutor argued, Tom could not have committed the crime, since he was not with Cody on November 5 or 6, 1999.  The prejudice caused to petitioner was exacerbated by counsel's further mistake of failing to object to the prosecutor's mischaracterization of the evidence during closing argument.  The prosecutor was permitted without objection to embellish Cody's statements regarding petitioner and to falsely claim that a psychologist had concluded that Cody was at the scene of the crime.

36

The prosecutor was further allowed to claim incorrectly that physical evidence proved that Tom Bledsoe did not commit the crime.

In a case where the credibility of Tom Bledsoe versus petitioner was critical, counsel's errors in voir dire placed petitioner in a bad light, arguably comparing his trial to a case involving a woman who had murdered her children and blamed another person on television before their bodies were found. Counsel's errors in failing to object to the testimony of Detective Frost also put the stamp of believability upon petitioner's alleged inculpatory statements regarding motive and opportunity.

The evidence regarding petitioner's opportunity to commit the murder is clouded by the testimony of different witnesses who stated that they saw petitioner during relevant times in the case. The credibility of Tom Bledsoe's testimony about petitioner's alleged confession is also clouded by the same type of evidence.

Although it is still possible that a jury would find petitioner guilty in the absence of his trial counsel's mistakes, that is not the test. See <u>Rompilla v. Beard</u>, 545 U.S. 374, 393 (2005). We conclude that an objectively reasonable adjudicator would find that there was a reasonable probability that, but for petitioner's counsel's deficient representation, a different outcome would have occurred.

3. <u>Failure to call or investigate witnesses</u>

Petitioner claims that his trial counsel provided ineffective

assistance of counsel by failing to call or investigate several

persons as witnesses.  When this issue was raised before the state

court upon the state habeas petition, the Kansas Supreme Court

stated:

> [Petitioner] also argues that [his counsel] was
> ineffective because he failed to call several witnesses
> on [petitioner's] behalf.  Decisions on whether to call
> a certain witness are strategic and tactical and
> generally within the exclusive province of the attorney.
> See State v. Nunn, 247 Kan. 576, 581, 802 P.2d 547
> (1990); Winter v. State, 210 Kan. 597, Syl. ¶2, 502 P.2d
> 733 (1972).  Again, the defense strategy in this case was
> to direct blame at Tom.  We have thoroughly reviewed the
> record on the testimony of the witnesses [petitioner]
> suggests were necessary.  We conclude that the testimony
> would have been either inconclusive, cumulative, or,
> worse, would have confused the jury and obscured the
> theory of the defense. [His counsel's] failure to call
> the numerous witnesses cited by petitioner did not
> constitute deficient performance.

150 P.3d at 885.

Petitioner contends that the Kansas Supreme Court applied the

wrong standard in deciding whether his trial counsel's actions were

constitutionally deficient.  Petitioner asserts that the state

court relied too heavily on the notion that the selection of

witnesses is a matter of strategy which is generally within the

prerogative of counsel, rather than considering whether counsel's

decisions were reasonable.

Once again, we are entitled to presume that the state court

followed the law and there are no good grounds to find otherwise

here.  The court determined that counsel's actions were objectively

unreasonable in four aspects, as discussed previously.  We believe

the state court was not guilty of giving too much deference to the judgments of counsel with regard to witness selection and strategy. Reasonableness and fairness appeared to be the state court's guideposts in deciding whether counsel's performance was deficient, and its conclusions were not divorced from those considerations.

Even if the state court applied the wrong standard, we find that, whether a _de novo_ standard or an objective reasonableness standard is applied to our review, the state court's conclusion regarding the failure to call or investigate witnesses should be affirmed.

Petitioner contends that his trial counsel should have called Dale and Danielle Hawk, James Gardner and Dustin Baalman as witnesses because they would have placed petitioner at some place which contradicted Tom Bledsoe's claim that he spoke with petitioner on the roadside and petitioner confessed to him on Saturday, November 6, 1999.  According to a police report the Hawks might have testified that petitioner stopped by their house between noon and 12:30 p.m. on Saturday.  James Gardner reported that petitioner stopped by his house at 12:30 p.m. on that day.  Dusten Baalmann stated that he saw Tom Bledsoe purchase gas at a station at 1:30 p.m.

Petitioner's trial counsel introduced testimony at trial that petitioner was with Detective Carreno from 9:00 a.m. until 12:17 p.m. and again from 1:48 p.m. until 5:45 p.m.  He also introduced

testimony that petitioner was seen by Fred Smelser just before 12:30 p.m. on the roadside with flyers, by Annette McNary at the high school passing out flyers in the morning or early afternoon, and that Scott Harries was with him passing out flyers until "around 1:30 p.m." Tr. 215. It should be remembered that Tom Bledsoe testified somewhat vaguely and inconsistently about the time of the alleged confession. He estimated that it was between 11:00 a.m. and 1:00 p.m. and stated that after the confession, he filled up his vehicle, visited a friend to perform an errand, and drove to his job in Lawrence arriving about 2:50 p.m.

Upon our review of the record, the court does not believe the proposed testimony of the Hawks, Gardner and Baalmann would have supplemented the record substantially and to petitioner's benefit.

Petitioner contends that his counsel should have called Rev. Michael Waggoner as a witness because he would have testified that Tom Bledsoe showed interest in his 14-year-old niece. The investigative report upon which this contention is based merely states that Tom Bledsoe "showed some interest . . . never . . . beyond flirting" with the girl. Exhibit 7 to state habeas record. There was no indication of what was meant by "flirting" but, given the conservative nature of the church as described in the testimony, the actions may not have been considered relevant. Petitioner's counsel did present evidence that Tom Bledsoe said he loved the victim in this case. There was also evidence that Tom

Bledsoe possessed pornographic videotapes, a pornographic magazine, and once attempted bestiality.  The court does not believe Rev. Waggoner's proposed testimony would have added significantly to the evidence of Tom Bledsoe's motive from a defense perspective.

Petitioner argues that his counsel should have presented the testimony of Randy Turner, Leanna Grammer, Rebecca Coffey and Dale and Danielle Hawk about petitioner's efforts to search for C.A.  Of course, there was testimony regarding petitioner's efforts to search for C.A. which was presented at trial.  Petitioner's wife testified in this regard as did several other witnesses.  There was testimony that petitioner brought the police to his house and that he rode with police, at petitioner's request, for several hours. Most of the testimony in this regard concerned petitioner's activities on Saturday, November 6, 1999.  While Grammar and Turner may have been able to testify that petitioner stopped by their residences on Sunday, November 7, 1999 to ask for information about C.A., and the other witnesses would have addressed petitioner's efforts on Saturday, we do not believe the failure to present such testimony amounted to deficient performance.

Petitioner asserts that his counsel was deficient because he did not present the testimony of Martin Schweda and Cindy Kelsay regarding pistol gunshots from the direction of petitioner's trailer which Schweda heard on Friday, November 5, 1999 at approximately 4:15 to 4:20 p.m. and three or four gunshots Kelsay

heard Saturday, November 6, 1999 at approximately 8:10 a.m.
Petitioner asserts that this evidence would have been important
because petitioner had an alibi for that period of time.

However, the evidence was that C.A. left the school bus at
4:20 p.m. and was missing by 5:00 or 5:10 p.m.  So, the relevance
of those gunshots is questionable.  Moreover, Tom Bledsoe had an
alibi for those time periods as well.

Finally, petitioner claims that petitioner's counsel should
have presented the testimony of Dan Courtney and Megan Koons.
However, petitioner's counsel did call Dan Courtney as a witness
and presented the statements of Megan Koons through his examination
of Detective Carreno.  Tr. 583, 621.

"Generally, counsel's failure to call witnesses whose
testimony would be corroborative or cumulative of evidence already
presented at trial is not deemed constitutionally deficient."  Snow
v. Sirmons, 474 F.3d 693, 729 (10th Cir. 2007).  In addition, upon
review of a habeas petition, a court may consider reasons for not
calling witnesses which are not alleged as part of counsel's trial
strategy.   Sallahdin v. Mullin, 380 F.3d 1242, 1250-51 (10th Cir.
2004) cert. denied, 544 U.S. 1052 (2005).  In our review of the
instant matter, we concur with the evaluation of the state supreme
court in denying petitioner's claim that his counsel was deficient
for failing to call and investigate potential witnesses.  The
testimony would have been irrelevant, inconclusive, cumulative or

confusing to the jury.

        4. <u>Failure to object to testimony regarding Tom Bledsoe</u>
<u>by Jim Bolinger and Catherine Bledsoe</u>

    Petitioner contends that his trial counsel was deficient
because he did not object to testimony from Jim Bolinger regarding
Tom Bledsoe's church attendance and testimony from Tom Bledsoe's
mother, Catherine Bledsoe, that she told petitioner, "I know Tom
didn't do it."

    Jim Bolinger testified that he knew Tom Bledsoe through the
Countryside Baptist Church, where Bolinger had been a church
leader.  He stated that Tom Bledsoe attended every service for ten
or twelve years; that boys and girls should be separated unless
supervised; that Tom lived his life according to those rules as far
as Bolinger was aware; that he felt close to Tom; that Tom never
confided to him about any feelings toward C.A.; that Tom did not
drink beer with buddies, chase women or go to bars; that he was not
aware of any reports that Tom had gotten in trouble or "messed with
some boys" during a church retreat; and, on cross-examination, that
he was not aware that Tom had viewed pornographic videotapes and
magazines.  Regarding the complaint about the church retreat,
Bolinger testified that Tom was a "good man" and that he did not
believe the report was true.

    The Kansas Supreme Court held that this testimony was relevant
to Tom's alibi for his activities on the night of C.A.'s

disappearance and relevant to Tom's relationship with C.A. as well as his relationship with Jim Bolinger to whom he left two incriminating phone messages.

There was nothing in Bolinger's testimony which directly vouched for the truthfulness of Tom Bledsoe. The testimony regarding the church was relevant to Bolinger's relationship with Tom Bledsoe and relevant to Tom Bledsoe's relationship with C.A. The testimony on direct and cross-examination obviously demonstrated the basis for and the holes in Bolinger's knowledge of Tom Bledsoe. Furthermore, contrary to petitioner, the testimony did not violate K.S.A. 60-430 which merely grants a witness the privilege to refuse to disclose his theological opinion or religious belief, when that is not material to any issue other than the credibility of the witness.

Petitioner also claims that his counsel should have objected that Bolinger did not have adequate personal knowledge for his testimony. The testimony was that Bolinger had known Tom Bledsoe for approximately 12 years and saw him three or four times a week during that time. Bolinger said he felt close to Tom Bledsoe. There was no clear objection available to petitioner's trial counsel on the grounds of lack of personal knowledge.

In conclusion, the Kansas Supreme Court was objectively reasonable in rejecting this part of petitioner's ineffective assistance of counsel claim.

44

Regarding Catherine Bledsoe's testimony, petitioner argues that his trial counsel should have objected to the following testimony:

> Q. While [petitioner] was in jail did he call you?
> A. Yes.
> Q. And at one point did he say something that was unusual?
> A. Yeah, he was, I don't remember exact date or anything, I know it was in the afternoon, he called me and he said that he didn't do it and I says, "Well, I know Tom didn't do it." And he says, "Yes, I know Tom didn't do it, somebody else did it."
> Q. Did he say who?
> A. No.
> Q. Did he blame it on his dad?
> A. Yes, he did. He says, "Well, maybe Dad did it, then." And I says, " . . . that's not true."

Tr. 452. Petitioner claims that his mother should not have been permitted to vouch for Tom Bledsoe's innocence on the witness stand. It should be noted that, in considering the prejudice from this testimony, the prosecutor in closing argument told the jury, "Ladies and gentlemen, [petitioner's] mom told you what happened. His mom told you that Tom didn't do it." Tr. 680. The prosecutor also stated: "Ladies and gentlemen, Mom, [petitioner], and Cody explained to you, it was [petitioner]." Tr. 665.

Petitioner's counsel testified in a deposition that he had no strategic reason for failing to object to this testimony. Deposition of John Kurth, p. 38-39.

The Kansas Supreme Court did not address this topic in any detail, only stating that it was adopting the "district court's determination that [petitioner] fails to meet his burden to show

that [his counsel's] representation was constitutionally deficient on this point." 150 P.3d at 884. The district court rejected petitioner's argument on the grounds that an objection "would have been overruled because it is not a statement of fact by Catherine, it is merely her testimony concerning her conversation with the Petitioner." Appellate court record of state habeas action, Vol. 1, p. 278.

The court does not believe the state supreme court's holding on this point was objectively reasonable. The law is clear in Kansas that a witness may not express an opinion on the credibility of another witness. <u>State v. Drayton</u>, 175 P.3d 861, 871 (Kan. 2008) (citing <u>State v. Jackson</u>, 721 P.2d 232 (Kan. 1986)). "This is because the determination of the truthfulness of a witness is for the jury." <u>Id</u>., (citing three Kansas cases). This rule applies even if the opinion of another witness' credibility is asked for indirectly. <u>Id</u>. Thus, for instance, it was improper to ask a nurse whether it appeared that an alleged victim of sexual abuse had been coached. <u>Id</u>. (referring to <u>State v. Mullins</u>, 977 P.2d 931 (Kan. 1999)). It was also held to be improper for a detective to testify that other suspects in a murder case were "honest." <u>Id.</u> (discussing <u>State v. Steadman</u>, 855 P.2d 919 (Kan. 1993)). Even expert witnesses with experience in interviewing people, such as psychologists and police witnesses, may not render on opinion on a witness' credibility. <u>Id</u>. at 872; see also, <u>State v. Elnicki</u>, 105

P.3d 1222, 1227 (Kan. 2005) (trial court has no discretion on whether to allow witness to express an opinion on the credibility of another witness; such evidence is inadmissible as a matter of law); <u>Jackson</u>, 721 P.2d at 237-38 (error to permit witnesses to testify that defendant committed the acts with which he was charged).

For the following reasons, we find the state court's position on this evidence objectively unreasonable.  The state court indicates that Catherine Bledsoe's statement that "I know Tom didn't do it" was just context for petitioner's statement that "Tom didn't do it."[3]  However, Mrs. Bledsoe could have explained that petitioner told her that "Tom didn't do it, somebody else did it" during a phone call from jail without adding her own extraneous part of the conversation.  It was not important to understanding what petitioner said.  Moreover, it was not argued by the prosecutor as context.  It was argued as direct evidence that Tom did not commit the crime and, therefore, that petitioner did.  In addition, even if it was context, it was so prejudicial for the jury to hear the credibility call of a mother in a swearing match between two brothers, that its prejudicial impact outweighed its contextual value.  Finally, there was no attempt by the attorneys or the trial judge to limit how the jury would consider the

---

[3] Petitioner does not argue that petitioner's part of the conversation with Catherine Bledsoe was inadmissible and, therefore, we assume that it was admissible.

testimony by petitioner's mother that "Tom didn't do it."  The jury was implored to consider that "Mom" told you what happened when she said that "Tom didn't do it."  Tr. 680.

### 5. Cumulative prejudice

The court shall consider the issue of prejudice from the failure to object to Catherine Bledsoe's "Tom didn't do it" statement, along with petitioner's contention that the cumulative prejudice from all of his counsel's errors requires that the court grant his habeas petition.

The prosecutor in this case argued in closing that Cody, Mom (Catherine Bledsoe), and petitioner explained that petitioner was guilty of the crime charged.  But for the mistakes of petitioner's trial counsel, the prosecutor could not have referred to Cody's alleged eyewitness statement or Mom's judgment that Tom Bledsoe did not commit the crime and, inferentially, was a credible witness. Without this evidence and without any physical evidence pointing to petitioner, the case against petitioner would largely boil down to Tom's claim that petitioner confessed to him.  In the absence of the previously described errors of counsel and Catherine Bledsoe's "Tom didn't do it" testimony, there is a reasonable probability that a jury would not believe Tom's testimony and find that petitioner was not guilty.

### B. Sufficiency of the evidence

Petitioner's final major argument is that the evidence

48

presented at his trial was insufficient to support each of his three convictions.  The parties agree that the standard this court must apply to this argument is whether upon the evidence produced for the record at trial any rational trier of fact could have found petitioner guilty beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Rojem v. Gibson, 245 F.3d 1130, 1141 (10th Cir. 2001).  "[T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  Jackson, 443 U.S. at 318-19.  The Tenth Circuit has further stated:

> This standard reflects our system's long-standing principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial.  Our review under this standard is sharply limited, and a court faced with a record of historical facts that supports conflicting inferences must presume - - even if it does not affirmatively appear on the record - - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

Turrentine v. Mullin, 390 F.3d 1181, 1197 (10th Cir. 2004) cert. denied, 545 U.S. 1106 (2005) (internal citations and quotations omitted).

        1. First degree murder

    Petitioner contends that there is no evidence to support a finding that he intentionally and with premeditation committed murder.  In Kansas, premeditation is defined as "the process of simply thinking about a proposed killing before engaging in the homicidal conduct."  State v. Rice, 932 P.2d 981, 996 (1997).  The

manner of the killing as well as the planning involved in obtaining the weapon was sufficient to permit a rational jury to find that the murder was premeditated.  See <u>Cooper v. Mitchell</u>, 647 F.2d 437, 441 (4th Cir.) <u>cert. denied</u>, 454 U.S. 849 (1981) (murder at close range suggests premeditation).

Petitioner contends that the evidence was not sufficient to tie petitioner to the homicide because witnesses placed him at the hardware store or at Zule's dairy and that he did not have access to Tom Bledsoe's gun or the bullets Tom Bledsoe purchased in the afternoon of November 5, 1999.

A rational jury could have decided on the basis of petitioner's confession to Tom Bledsoe that petitioner committed the homicide.  See <u>U.S. v. Treas-Wilson</u>, 3 F.3d 1406, 1409 (10th Cir. 1993) <u>cert. denied</u>, 510 U.S. 1064 (1994) (dead body, manner of death, and six detailed confessions provide sufficient evidence of murder); <u>U.S. v. Wilson</u>, 529 F.2d 913, 915 (10th Cir. 1976) (in weapon conveyance trial, it was unnecessary that there be independent corroborative evidence that it was the accused who perpetrated the crime, the confession alone was sufficient); <u>U.S. v. Begay</u>, 441 F.2d 1136, 1137 (10th Cir. 1971) (evidence of store burglary consistent with confession is sufficient to support conviction).  The witness testimony indicating the location of petitioner at different times on November 5, 1999 and the following date do not foreclose a rational jury from finding Tom Bledsoe's

account of petitioner's confession to be credible or from finding petitioner guilty of first degree murder.   In addition, we would note that our reading of the trial transcript indicates that Tom Bledsoe testified that he did not purchase the bullets in the murder weapon on November 5, 1999; rather it was before that date. Tr. 330-33.

   2. <u>Kidnapping</u>

Petitioner asserts that there was insufficient evidence that C.A. was taken or confined by force or threat.   The Kansas Supreme Court held that the evidence that a hunter heard a young women scream for help near the Zule dairy at approximately 5:45 p.m., together with the other evidence presented in the case, provided sufficient evidence for a rational jury to find petitioner guilty beyond a reasonable doubt.   This was a reasonable finding in our opinion.   Therefore, we reject petitioner's claim.

   3. <u>Aggravated indecent liberties</u>

Petitioner's last claim is that the evidence was insufficient to support petitioner's conviction of the crime of aggravated indecent liberties with a child.   This contention must be rejected. The victim was found with her shirt and bra pulled above her breasts leaving them exposed.   There was testimony that this would not have occurred in the process of dragging the body after the victim was shot.   Petitioner's confession to Tom Bledsoe indicated that petitioner may have molested the victim.   Consequently, a

51

rational jury could have found petitioner guilty of the crime.

VI. CONCLUSION

For the reasons stated above, the court finds that petitioner was denied his constitutional right to the effective assistance of counsel. The state court's conclusion to the contrary represents an unreasonable application of clearly established federal law. Accordingly, the court shall grant petitioner's application for relief under 28 U.S.C. § 2254 subject to the condition that the state retry petitioner within a reasonable time or be subject to further federal proceedings to consider his release.

**IT IS SO ORDERED.**

Dated this 23rd day of June, 2008 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge